UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF MARIPOSA CREEK, an unincorporated association, and SARAH WINDSOR, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>MARIPOSA PUBLIC UTILITIES DISTRICT, a public utility district,<br><br>Defendant. | Case No. 1:15-cv-00583-GSA<br><br>**ORDER RE: DEFENDANT MARIPOSA PUBLIC UTILITIES DISTRICT'S MOTION TO DISMISS**<br><br>**(ECF No. 6)** |

Plaintiffs Friends of Mariposa Creek and Sarah Windsor (collectively, "Plaintiffs") brought this private citizen action against defendant Mariposa Public Utilities District ("District" or "Defendant") alleging violations of the Clean Water Act under 33 U.S.C. § 1365. (ECF No. 1.) Defendant has moved to dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and (6). The Court has reviewed the papers and determined that this matter is suitable for decision without oral argument pursuant to Local Rule 230(g). After a review of the pleadings and for the reasons set forth below, the Court determines that the Motion to Dismiss will be DENIED.

## I.     BACKGROUND

This case revolves around the alleged discharge of pollutants by the District into Mariposa Creek. The District, a public utility district, operates a water treatment facility in Mariposa, California. As a byproduct of the water treatment process, the facility releases dichlorobromomethane ("DCBM") and copper into the creek. Both chemicals can be toxic to aquatic life and/or humans in certain concentrations. The District monitors the concentration of these chemicals that is released into the creek and submits reports to the State and Regional Water Quality Control Boards.

### A.  The 2007 Permit

Pursuant to the terms of the federal Clean Water Act, its implementing regulations, and the California Water Code, the California Regional Water Quality Board, Central Valley Region (the "Regional Water Board") issued a National Pollutant Discharge Elimination System permit to the District on December 6, 2007 (the "2007 Permit"). The 2007 Permit, which took effect on January 25, 2008, limited the amount of daily, weekly, and monthly DCBM and copper emissions that the facility could discharge.[1] The 2007 Permit informed the District that any noncompliance (*e.g.*, discharge over the specified limitations) would be a "violation of the Clean Water Act and the California Water Code and is grounds for enforcement action, for permit termination, revocation and reissuance, or modification, or denial of a permit renewal application." (Defendant's Request for Judicial Notice, Exh. A, pg. 42, ECF No. 8-1.)[2] It also gave the Regional Water Board the authority to enforce the terms of the Permit under sections 13385, 13386, and 13387 of the California Water Code. *Id.* at 50.

On August 6, 2009, the District submitted a proposed work plan to the Regional Water Board that proposed changes to bring the District's emissions into compliance with the 2007 Permit by 2017. The Regional Water Board rejected the plan, stating that a plan for compliance could not be accepted if it extended more than five years into the future. On January 7, 2011, the District submitted a new proposed work plan that detailed technical upgrades to the facility that

---

[1] For example, the maximum daily final limitation for DCBM was 1.1 μg/L.
[2] Exhibit page numbers will be identified by the CM/ECF generated page number on the upper right hand corner of each document.

would cost approximately $7,300,000. The proposed upgrades would bring the District into compliance with the 2007 Permit by March 2011 with respect to copper and by December 2017 with respect to DCBM.

### B. The Time Scheduling Orders

On July 13, 2011, the Regional Water Board issued a Time Schedule Order (the "2011 TSO") to the District. The 2011 TSO, which was issued under California Water Code § 13385, found that the District was "unable to consistently comply with the final effluent limitations for dichlorobromomethane contained in [the 2007 Permit]." (Defendant's Request for Judicial Notice, Exh. B, pg. 6, ECF No. 8-2.) The 2011 TSO then set a schedule designed to bring the District into compliance with the DCBM limitations in the 2007 Permit. Among other things, it required the District to begin the implementation of their upgrade plan by August 1, 2011 and submit semi-annual progress reports to the Regional Water Board. It also provided an "interim effluent limitation" for DCBM to be effective from July 13, 2011 to May 17, 2015. The interim maximum daily limitation, for instance, was set at 9.4 µg/L. Finally, the 2011 TSO noted that the "[i]ssuance of this Order does not preclude the Central Valley Water Board from taking additional enforcement actions against the Discharger. If compliance is not achieved by the full compliance date, the discharge[r] will be subject to mandatory minimum penalties for violations of the final effluent limitations for dichlorobromomethane." *Id*. at 10.

### C. The Administrative Complaint

On September 19, 2013, the Regional Water Board served a Notice of Violation on the District. The Notice stated that the Regional Water Board was considering issuing an Administrative Civil Liability Complaint under California Water Code § 13385 for violations of the 2007 Permit between February 2008 and July 2013. The Notice described 30 separate violations subject to mandatory minimum penalties, amounting to $90,000 in penalties. The violations were primarily composed of DCBM violations and included one copper violation. On October 7, 2013, the District responded to the Notice and agreed with the identified violations.

On December 30, 2013, the Regional Water Board issued an Administrative Civil Liability Complaint for violations to the 2007 Permit between February 1, 2008 and July 30, 2013

Case 1:15-cv-00583-EPG   Document 22   Filed 09/24/15   Page 4 of 18

(the "Administrative Complaint"). The Regional Water Board assessed $87,000 in penalties and provided the District the option of engaging in a "compliance project," rather than paying the full amount in penalties. The Administrative Complaint also explained that the District was a "publicly owned treatment works serving a small community with a financial hardship." *Id.* at 18. The Administrative Complaint set a hearing for March 27 and 28, 2014 and explained that, if the matter proceeded to a hearing, the Regional Water Board could amend the proposed amount of liability according to evidence presented at the hearing. *Id.* at 19. The District waived its right to a hearing on the Administrative Complaint and elected to enter into settlement discussions. The results of those discussions were unclear at the time this case was filed; the Regional Water Board has not issued a final order on the Administrative Complaint or opened a period for public review and comment on that order.

On March 28, 2014, the Regional Water Board issued a new National Pollutant Discharge Elimination System Permit (the "2014 Permit") to the District that superseded the 2007 Permit. The 2014 Permit limited the maximum daily DCBM emissions to 1.3 µg/L and the maximum daily total recoverable copper effluent to 13 µg/L.

Also on March 28, 2014, Regional Water Board issued a second Time Scheduling Order, which was later amended (the "2014 TSO"). The 2014 TSO detailed the steps that the District had taken to comply with the requirements of the 2014 Permit and found that the District had been making progress towards compliance. It also granted a time schedule extension to bring the District's DCBM output within the established limitations until May 17, 2020 and set an interim maximum daily limitation for DCBM of 49 µg/L. As before, the 2014 TSO preserved the authority of the Regional Water Board by saying that:

> If, in the opinion of the Executive Officer, the Discharger fails to comply with the provisions of this Order, the Executive Officer may refer this matter to the Attorney General for judicial enforcement, may issue a complaint for administrative civil liability, or may take other enforcement actions. Failure to comply with this Order or with the [Waste Discharge Requirements] may result in the assessment of Administrative Civil Liability of up to $10,000 per violation, per day, depending on the violation, pursuant to he Water Code, including sections 13268, 13350 and 13385. The Central Valley Water Board reserves its right to take any enforcement actions authorized by law.

(Defendant's Request for Judicial Notice, Exh. E, pg. 14, ECF No. 8-5.)

4

### D. Plaintiffs Initiate a Citizen Suit

Plaintiffs provided timely notice of their intent to sue the District and filed suit on April 15, 2015. (ECF No. 1.) Plaintiffs allege that neither the EPA nor the State of California have diligently prosecuted any action against the District for violations of the Clean Water Act after July 5, 2011 (the date of the last DCBM violation identified in the Administrative Complaint). Plaintiffs further allege that even the violations in the period covered by the Administrative Complaint have not been diligently prosecuted because no final order has been issued and no penalties have been assessed or paid. Based on this lack of enforcement, Plaintiffs filed a citizen suit under 33 U.S.C. § 1365. Plaintiffs request declaratory relief in the form of an order finding that the District has violated the 2007 Permit from May 18, 2010 to March 27, 2014 and the 2014 Permit since March 28, 2014. They also request injunctive relief enjoining the District from violating the limitations set in the 2014 Permit and requiring the District to repair any injury caused to Mariposa Creek as a result of their violations. Finally, Plaintiffs request civil penalties against the District and an award of costs, including attorney fees.

## II. REQUESTS FOR JUDICIAL NOTICE

The District requests the Court take judicial notice of the following documents maintained by the Regional Water Board: Order No. R5-2007-0171 NPDES No. CA0079430, issued on December 6, 2007 (the 2007 Permit); Time Schedule Order R5-2011-0905, issued on July 13, 2011 (the 2011 TSO); Administrative Liability Complaint R5-2013-0590, issued December 30, 2013, and attached Notice of Violation and waiver form (the Administrative Complaint); Order No. R5-2014-006 NPDES No. CA0081759; and Order Amending Time Scheduling Order R5-2014-0043 (the 2014 TSO). Plaintiffs object to Order No. R5-2014-006 NPDES No. CA0081759, saying that it is not relevant because it appears to apply to a different water treatment facility located in El Portal, California, but do not object to notice of the other documents. Plaintiffs, in turn, have requested that the Court take judicial notice of Order No. R5-2014-0042 NPDES No. CA0079430, issued on March 28, 2014 (the 2014 Permit). Defendant does not object to Plaintiffs' Request for Judicial Notice.

Courts may take judicial notice of facts "not subject to reasonable dispute" when they are either: "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. With the exception of Order No. R5-2014-006 NPDES No. CA0081759, which appears to be irrelevant to the issues in this case, the Court takes judicial notice of the requested documents. *U.S. v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (courts may "take judicial notice of 'matters of public record'" and consider them when ruling on a motion to dismiss).

## III.   DISCUSSION

### A. Legal Standards for a Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires a district court to dismiss an action if it lacks subject matter jurisdiction over an action. In a motion under Rule 12(b)(1), a defendant may make an attack on the face of the allegations contained in a complaint or attack the factual basis for the court's subject matter jurisdiction. *Thornhill Publ'n Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). In a facial attack, the court must construe the factual allegations in the complaint as true. *Arden v. Oliver*, No. 2:14-cv-1777 TLN DAD PS, 2015 WL 1768092, at *3 (E.D. Cal. April 17, 2015). In a factual attack, however, the defendant "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). As a result, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id., citing Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003). The court need not "presume the truthfulness of plaintiff's allegations." *Id.*

Despite these advantages for the defendant, "jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional." *Id., citing Sun Valley Gas, Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir. 1983). Courts must thus tread lightly where "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Id.*

6

**B. The Regional Water Board's Actions Do Not Strip the Court of Jurisdiction**

Defendant asserts that prior enforcement actions by the Regional Water Board, in the form of the two TSOs and the Administrative Complaint, deprive the court of subject matter jurisdiction to hear a citizen suit by Plaintiffs.

The Clean Water Act "makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 52 (1987). To regulate these discharges, the Act empowers the Environmental Protection Agency to issue permits authorizing the release "of pollutants in accordance with specified conditions." *Id., citing* 33 U.S.C. § 1342(a). Alternatively, states may administer their own permit programs, provided that those programs are run in accordance with federal guidelines. *Id.* If a permit is issued and the permit holder fails to abide by the conditions in the permit, the permit holder may find itself subject to an enforcement action by the applicable state agency. Such an enforcement action can include the possibility of "administrative, civil, and criminal sanctions." *Id.* at 53, *citing* 33 U.S.C. § 1319. Should the agency fail to enforce the guidelines, "private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." *Id.*, *citing* 33 U.S.C. § 1365(a)(1). A private citizen that prevails in an action under § 1365 may be entitled to "injunctive relief and/or civil penalties." *Id.*

Citizen suits under § 1365 may, however, be barred by 33 U.S.C. § 1319(g)(6)(A), which states that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under . . . section 1365." In other words, if a state agency: (1) commences an enforcement action under a state law "comparable" to the Clean Water Act; and (2) "diligently prosecutes" that enforcement action, no civil penalty action may proceed. *Friends of Frederick Seig Grove #94 v. Sonoma Cnty. Water Agency*, 124 F.Supp.2d 1161, 1170 (N.D. Cal. 2000). The section of the California Water Code under which the TSOs and Administrative Complaint were issued is a state law "comparable" to the Clean Water Act. *Citizens for a Better Environment-California v. Union Oil Co. of Cal.*, 83 F.3d 1111, 1116-1117 (9th Cir. 1996) ("It is undisputed

7

1   that that penalty provision in § 13385 of the California Water Code is comparable to the federal

2   Clean Water Act penalty provision of 33 U.S.C. § 1319"). The issue is thus whether the Regional

3   Water Board's actions were "diligent prosecution" under that law.

4       Defendant contends that the TSOs and Administrative Complaint constituted "diligent

5   prosecution" because:  (1) the standard for diligent prosecution in the First and Eighth Circuit

6   Courts of Appeal is very low; and (2) citizens should be precluded from pursuing private actions

7   for potential violations where those actions could undermine the "State's ability to reach

8   voluntary settlements with defendants." (Defendant's Motion to Dismiss 10:13-24, ECF No. 7.)

9       Plaintiffs respond that:  (1) the standard for diligent prosecution in the Ninth Circuit

10  requires that a penalty has been assessed; (2) the TSOs do not propose or assess any penalties; (3)

11  even if the Administrative Complaint proposed a penalty, that penalty was never assessed because

12  a final order was never entered; and (4) in any case, the penalty proposed in the Administrative

13  Complaint was wholly inadequate for the violations alleged and thus cannot constitute "diligent

14  prosecution." (Plaintiffs' Opposition to Defendant's Motion to Dismiss 15:10-16:20, ECF No.

15  12.)

### 1. *Legal standard.*

The Ninth Circuit requires a state agency to have assessed a penalty to demonstrate diligent prosecution. *Knee Deep Cattle Co. v. Bindana Inv. Co. Ltd.*, 94 F.3d 514, 516 (9th Cir. 1996) ("for § 1319(g)(6)(A) to apply, the comparable state law must contain penalty provisions and a penalty must actually have been assessed under the state law"). A defendant's "*potential* liability" for penalties in an administrative action is not enough; the penalties must "actually have been assessed." *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 877 (9th Cir. 2013) (holding that a consent order containing language saying that a defendant "'may be liable for penalties' in the future if they fail to comply with the terms of those orders" failed to assess any penalties and thus did not constitute diligent prosecution) (emphasis in original).

### 2. *The TSOs.*

Neither the 2011 TSO nor the 2014 TSO assessed "penalties" against the District. The plain text of the 2011 TSO, for example, promises only that the District "will be subject to

mandatory minimum penalties" in the future "[i]f compliance is not achieved by the full compliance date." (Defendant's Request for Judicial Notice, Exh. B, pg. 10, ECF No. 8-2.) The 2014 TSO contains similar language. (Defendant's Request for Judicial Notice, Exh. E, pg. 14, ECF No. 8-5 ("Failure to comply with this Order or with the WDRs may result in the assessment of Administrative Civil Liability of up to $10,000 per violation, per day, depending on the violation, pursuant to the Water Code, including section 13268, 13350 and 13385").) Because they offer only the potential of future penalties, the TSOs do not constitute "diligent prosecution."

Defendant suggests that the TSOs impose other, non-monetary penalties on the District in the form of reporting requirements and other tasks that are designed to bring the District into compliance with the applicable permits. However, the only case law that Defendant produces in support of this proposition are cases from other circuits broadly holding that "diligent prosecution" is a low standard to meet and that courts ought to defer to agency determinations about how to pursue enforcement actions.

But these cases do not speak to the specific argument that Defendant seeks to make: that a penalty constituting "diligent prosecution" can take the form of a non-monetary penalty. Nor could they—the penalty requirement appears to distinguish the Ninth Circuit from the other circuits identified by Defendant. *Compare Knee Deep Cattle*, 94 F.3d at 516 ("for § 1319(g)(6)(A) to apply, the comparable state law must contain penalty provisions and a penalty must actually have been assessed under state law") *with Karr v. Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007) ("Nor must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff. As expressed by the Sixth Circuit, '[S]econd-guessing of the EPA's assessment of an appropriate remedy . . . fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not whether the EPA has acted but has not acted aggressively enough in the citizens' view").

The Ninth Circuit Court of Appeal has previously found a distinction between monetary penalties sought in an administrative penalty action and non-monetary "penalties" sought in an administrative compliance action. *Wash. Pub. Interest Research Group v. Pendleton Woolen*

9

*Mills*, 11 F.3d 883 (9th Cir. 1993). In *Pendleton*, the court found that an order that required a defendant to "prepare a report describing the causes of the violations and identifying the actions necessary to bring it into compliance" as well as "to make those physical improvements" did not constitute "an administrative penalty under section 1319(g)." *Id.* at 885. Although *Pendleton* considered the "diligent prosecution" bar in the context of § 1319(g)(6)(A)(i), rather than (ii) (the statute at issue in the current Motion), the Ninth Circuit later cited to *Pendleton* in construing (ii) and holding that "a penalty must actually have been assessed" to find "diligent prosecution." *Knee Deep Cattle*, 94 F.3d at 516; *Pendleton*, 11 F.3d at 886. The penalty requirement enunciated by the Ninth Circuit thus assumes penalties beyond mere compliance measures. *N. Cal. River Watch v. Sonoma Cnty. Water Agency*, No. C 97-4263 CRB, 1998 WL 886645, at *7 (N.D. Cal. Dec. 16, 1998) ("the Board's continued monitoring of defendants is not sufficient to keep plaintiff from seeking civil penalties here").

This Court is bound to follow the decisions of the Ninth Circuit Court of Appeals and declines to adopt Defendant's suggested standard for diligent prosecution.[3] *Hart v. Massanari*, 266 F.3d 1155, 1172-73 (9th Cir. 2001) ("Thus, an opinion of our court is binding within our circuit, not elsewhere in the country. The court of appeals, and even the lower courts of other circuits, may decline to follow the rule we announce—and often do"). In the case at bar, the TSOs do not constitute diligent prosecution because they did not assess any monetary penalties on the District.[4]

This outcome comports with common sense: like the TSOs, the 2007 Permit also imposes some non-monetary requirements on the District (including, for example, a requirement that the District monitor the contents of its discharges and submit reports to the Regional Water Board), but it would make little sense to describe the mere issuance of a permit as a "prosecution," diligent or otherwise, on the part of the Regional Water Board. Such a reading is not consistent

---

[3] For similar reasons, the Court does not find Defendant's policy arguments discussing the state's ability to reach voluntary settlements with defendants availing.

[4] This case is thus also distinguishable from the decision in *Friends of Frederick Seig Grove #94 v. Sonoma County Water Agency*, 124 F.Supp.2d 1161 (N.D. Cal. 2000). There, the court found that an administrative complaint and time scheduling order constituted diligent prosecution because the administrative complaint had "issued an immediate $25,000 penalty and two contingent $50,000 penalties for the defendants' anticipated failure to comply." *Id.* at 1170. No such facts are present here.

with the process laid out in the Clean Water Act, which allows enforcement actions for "failure to comply with the conditions of [a NPDES] permit." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52-53 (1987). The issuance of a permit, by itself, cannot thus constitute an enforcement action. Nor can the issuance of the TSOs, by extension.

### 3. *The Administrative Complaint.*

Whether the Administrative Complaint constitutes diligent prosecution under § 1319 is a closer question. Plaintiffs point out that the express terms of the Administrative Complaint suggest that no diligent prosecution has occurred because they only "propose" a penalty, rather than assessing one outright. They also argue that the prosecution of the Administrative Complaint has been characterized by a distinct lack of action on the part of the Regional Water Board and that the proposed penalties are far below those called for by the California Water Code.

Defendant argues that the Complaint contains an allegation that an $87,000 penalty was imposed and claims that the fact that "a penalty was assessed as a result of the [Administrative Complaint] is a matter that is absolutely beyond any dispute." (Defendant's Reply Brief 10:11-12, ECF No. 17.) Contrary to Defendant's claim, the Complaint only contains an allegation that the Administrative Complaint "*proposed* a mandatory minimum penalty." (Complaint ¶ 6, ECF No. 1 (emphasis added).) And, in any case, as explained above, the Court is not bound by the allegations in a complaint on factual challenge under Rule 12(b)(1). *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

After a review of the Administrative Complaint and attached exhibits, the Court finds that the Administrative Complaint does not assess a penalty on the District. Consequently, there was no diligent prosecution under § 1319(g)(6)(A) and Plaintiffs' suit for civil penalties is not barred as a matter of law. There are three reasons for this determination.

**First**, as Plaintiffs note, the plain terms of the Administrative Complaint do not support the assertion that a penalty has been assessed. The cover page of the Administrative Complaint, when describing Defendant's options in responding, explains that Defendant may "[p]ay the *proposed administrative civil liability* and waive its right to a hearing." (Defendant's Request for Judicial Notice, Exh. C, pg. 13, ECF No. 8-3 (emphasis added).) The body of the Administrative

11

Complaint, after a recitation of facts and law, concludes that "[t]he Assistant Executive Officer of the Central Valley Water Board *proposes* that the Discharger *be assessed* an Administrative Civil Liability in the amount of $87,000." (Defendant's Request for Judicial Notice, Exh. C, pg. 48, ECF No. 8-3 (emphasis added).) The Administrative Complaint, in other words, contemplates the assessment of penalties in the future. It also explains that "[i]f this matter proceeds to hearing, the Assistant Executive Officer reserves the right to amend the proposed amount of civil liability to conform to the evidence presented after the date of the issuance of this ACL Complaint through completion of the hearing." (Defendant's Request for Judicial Notice, Exh. C, pg. 19, ECF No. 8-3.) Thus, no final calculation of penalties had occurred at the issuance of the Administrative Complaint—a final assessment of penalties would only occur after a hearing on the matter. All of this language supports the conclusion that the Administrative Complaint was only *proposing* a penalty that may or may not have been assessed on Defendant after a hearing had occurred. *Natural Resources Defense Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204-1205 (9th Cir. 2013) ("If the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning'"), *quoting Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 270 (4th Cir. 2001).

**Second**, the Administrative Complaint indicates that the District elected not to proceed to a hearing in favor of engaging in settlement discussions with the Regional Water Board. (Defendant's Request for Judicial Notice, Exh. C, pg. 23, ECF No. 8-3.) A settlement agreement, however, "is not sufficient to constitute diligent prosecution under a comparable state law—the state must actually levy a fine against the defendant." *N. Cal. River Watch v. Sonoma Cnty. Water Agency*, 1998 WL 886645, at *7 (N.D. Cal. Dec. 16, 1998). If a settlement agreement is not diligent prosecution under § 1319(g)(6)(A), there is little reason why the negotiations leading up to such a settlement agreement should be considered so.

**Third and finally**, the limited scope of the alleged violations in the Administrative Complaint suggests a lack of diligent prosecution. For each month that Defendant exceeded the monthly average effluent limitations, the Administrative Complaint appears to have assessed only

one violation. (Defendant's Request for Judicial Notice, Exh. C, pg. 20-21, ECF No. 8-3.) But the Regional Water Board could have found a violation for each day within the months during which Defendant exceeded the monthly average effluent limitations (as Plaintiffs are alleging in the Complaint). *Sierra Club v. City & Cnty. of Honolulu*, 486 F.Supp.2d 1185, 1190-1191 (D. Haw. 2007). While the mere fact that the Regional Water Board has sought less than the "remedy sought in the complaint in the citizen suit does not establish that the state failed to prosecute its action diligently," it can be "properly considered by the court in determining whether the state action was diligently prosecuted." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 890 F.Supp. 470, 490 (D. S.C. 1995) ("A lenient penalty that is far less than the maximum penalty may provide evidence non-diligent prosecution"); *see also Ohio Valley Envtl. Coalition, Inc. v. HOBET MINING, LLC*, 723 F.Supp.2d 886, 908 (S.D. W. Va. 2010); *Atl. States Legal Found. v. Universal Tool & Stamping Co., Inc.*, 735 F.Supp. 1404, 1416-1417 (N.D. Ind. 1990) (given "the lenient penalty assessment of only $10,000 for the hundreds of reported violations, despite statutory authority for penalties of $25,000 per violation … it is clear that the IDEM proceeding was not 'diligent prosecution' under the Clean Water Act"). Although not dispositive on its own, this lack of aggressive enforcement, in conjunction with the other identified factors, establishes that the Administrative Complaint did not constitute diligent prosecution on the part of the Regional Water Board. The Court, therefore, maintains subject matter jurisdiction over the alleged claims.

**C. Legal Standards for a Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility standard," however, "asks for more than a sheer possibility that a defendant has acted unlawfully," and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most

favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899-900 (9th Cir. 2007). Legally conclusory statements, when unsupported by actual factual allegations, need not be accepted. *Ashcroft*, 556 U.S. at 678-79. A court may, however, consider documents other than the complaint when they are judicially noticeable under Federal Rule of Evidence 201 or where "no party questions their authenticity and the complaint relies on those documents." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

### D. The TSO Limitations Do Not Amend the Permit Limitations

Defendant argues that the Complaint has failed to state a claim because it ignores "the fact that the TSO's change the effluent limitation for DCBM . . . by increasing it to a level above that set by the NPDES Permits." (Motion to Dismiss 11:25-27, ECF No. 7.) In other words, the effluent discharges alleged in the Complaint do not constitute violations of the Clean Water Act because they do not exceed the limitations set by the TSOs.

A violation of the limits set in a NPDES permit is a violation of the Clean Water Act. 40 C.F.R. § 122.41 ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or denial of a permit renewal application"). As a general matter, a plaintiff "need only prove that [d]efendants violated the terms and conditions of their NPDES permit" to prevail in a citizen suit under the Clean Water Act. *Wishtoyo Found. v. Magic Mountain LLC*, No. CV 12-05600 GAF (MANx), 2014 WL 6841554, at *4 (C.D. Cal. Dec. 3, 2014). Defendant argues, however, that the 2011 and 2014 TSOs amended the terms of the 2007 and 2014 Permits, raising the effluent limitations permitted. Because Plaintiffs allege that the District exceeded the limitations set in the Permits, but not the limitations set in the TSOs, Defendant reasons, they have failed to state a claim. Nor could they state such a claim—the District was within the limitations set by the TSOs for the applicable time period.

The question, then, is whether the TSOs modified the limitations set in the Permits. The Court concludes that they do not. Other courts have concluded that interim limitations set by administrative agencies do not supersede the limitations set by an NPDES permit. In *Citizens for a Better Environment—California v. Union Oil Company of California*, 83 F.3d 1111 (9th Cir.

1996), for example, defendant entered into a settlement agreement which included a consent order. The consent order included a term which relieved defendant from meeting a discharge limitation in its NPDES permit until a date later than the date set by the permit. In the ensuing citizen suit, defendant argued that the consent order had the effect of modifying the compliance date set by the permit. The court concluded that the order did not modify the permit.

Most persuasively, the court found that the express terms of the consent order suggested that the Water Board "did not intend to modify the Permit but instead worked out a compliance schedule" with which defendant could comply. *Id.* at 1120. The court held that such a schedule was a mere "exercise of prosecutorial discretion" by which the Water Board elected not to pursue actual violations of the permit because the consent order reserved the right to "pursue appropriate action against the dischargers." *Id.* Specifically, the consent order said that if "the dischargers have failed to comply with the provisions of this Order [the official may] . . . request the Attorney General to take appropriate action against the dischargers, including injunctive and civil remedies, if appropriate, or to issue a complaint for Board consideration of Administrative Civil Liabilities." *Id.*

Defendant argues that *Union Oil* is distinguishable from the present case because, **first**, the consent order in *Union Oil* did not arise out of an administrative action, but out of a settlement between defendant and the Water Board. **Second**, the consent order did not contain "any language . . . that did in fact change the compliance date . . . and the [consent order] stated that it was being adopted in order to 'enforce the provisions' of the NPDES." Thus, Defendant claims, the TSOs in this case are distinguishable from the consent order because they expressly contain "interim limitations" that the District was to have met. **Third**, Defendant argues that the court in *Union Oil* only found that the consent order did not modify the NPDES permit because the consent order did not follow the extensive state and federal regulations required to modify an NPDES permit.

As an initial matter, Defendant is incorrect that the consent order contained no language modifying the ultimate compliance date set by the permit. The consent order, which is excerpted in relevant part, reads that "[t]he discharger shall implement a removal technology or technologies . . . capable of achieving ***compliance with the discharge limitations as specified in***

15

*the [NPDES permits] and shall comply with these limits, no later than July 31, 1998.*" *Id.* at 1114 (emphasis added). In the District's case, the TSOs appear to have been implemented for a similar reason: to achieve compliance with the Permits by a later date. (Defendant's Request for Judicial Notice, Exh. B, pg. 8, ECF No. 8-2 ("The interim effluent limitations, however, establish an enforceable ceiling concentration until compliance with the final effluent limitations can be achieved").)

Like the consent order, the TSOs also contain reservations allowing the Regional Water Board to pursue further actions against Defendant. The TSOs even use similar language to the consent order—the 2011 TSO maintains that "[i]f compliance is not achieved by the full compliance date, the discharge[r] will be subject to mandatory minimum penalties for violations of the final effluent limitations for dichlorobromomethane." (Defendant's Request for Judicial Notice, Exh. B, pg. 10, ECF No. 8-2.) Likewise, the 2014 TSO instructs that "[f]ailure to comply with this Order or with the [Waste Discharge Requirements] may result in the assessment of Administrative Civil Liability of up to $10,000 per violation, per day, depending on the violation, pursuant to the Water Code, including sections 13268, 13350 and 13385. The Central Valley Water Board reserves its right to take any enforcement actions authorized by law." (Defendant's Request for Judicial Notice, Exh. E, pg. 14, ECF No. 8-5.)

Defendant is correct that one of the reasons the *Union Oil* court found that the consent order did not modify the NPDES permit limitations is that the consent order did not follow the "federal and state regulations [which] govern the modification of NPDES permits." *Union Oil*, 83 F.3d at 1120. The TSOs, in contrast, appear to have been issued under the appropriate state and federal regulations.[5] But this rationale was only one of three reasons offered by the *Union Oil* court for its conclusions and nothing suggests that this rationale was the solely dispositive one. The reasoning in *Union Oil* is still persuasive, even with this distinguishing characteristic.

Other courts considering this question have used similar reasoning to find that interim limitations do not supersede permit limitations. In *Riverkeeper, Inc. v. Mirant Lovett, LLC,* 675

---

[5] Defendant stops short, however, of laying out the procedures required to modify an NPDES permit and establishing by extrinsic evidence that each of those steps was followed here. *Ackels v. U.S. E.P.A.*, 7 F.3d 862, 864 n. 1 (9th Cir. 1993). Accordingly, the Court is unable to examine or find that the proper modification procedure occurred.

F.Supp.2d 337 (S.D.N.Y. 2009), for instance, a defendant argued that it was complying with interim limitations set by a consent order, even if it was exceeding limitations set by an NPDES permit. The consent order, which set out a "Compliance Schedule" to bring the defendant into compliance with the NPDES permit, did not purport to amend the permit and reserved the state agency's right to pursue further enforcement remedies. *Id.* at 345. The court construed the order as merely an agreement not to enforce the limitations set forth in the permit and found that it did not modify the permit limitations. *Id* ("Settlements that merely provide for selective non-enforcement of permits by a state regulatory agency, without more, do not bar citizen suits under the CWA seeking enforcement of the terms of such permits"); *see also Frilling v. Village of Anna*, 924 F.Supp. 821, 844 (S.D. Ohio 1996) ("This Court is simply not authorized to defer to the State's discretion in certain, select cases by denying citizens their right to enforce NPDES permit limitations where the government has failed to do so . . . the Consent Order entered into by the parties did *not* suspend the legal effect of the NPDES limitations").

Because the express terms of the TSOs defer to the final Permit limitations, the Court determines that the TSO interim limitations did not supersede the final limitations set by the Permits. *Natural Resources Defense Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) ("Although the NPDES permitting scheme can be complex, a court's task in interpreting and enforcing an NPDES permit is not—NPDES permits are treated like any other contract"). By alleging that the District discharged pollutants over the limitations set in the 2007 and 2014 Permits, Plaintiffs have properly stated a claim under 33 U.S.C. § 1365. (Complaint ¶¶ 35-41, ECF No. 1); *Natural Resources Defense Council, Inc.*, 725 F.3d at 1204 ("[A] permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit"); *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 919 (C.D. Cal. 2009) ("The Act imposes strict liability for NPDES violations").

### E. Copper Violations

Defendant's final contention is that the Complaint has failed to state a claim with respect to copper discharges in violation of the 2007 and 2014 Permits. Defendant argues that of the seven violations alleged, four are addressed in the Notice of Violation to the Administrative

Complaint. Of those four, two were not subject to mandatory minimum penalties because they did not occur in a consecutive six-month period. The implied argument is that these violations should not be actionable because they were never subject to penalties. But Defendant cites to no case law establishing that an effluent discharge must be subject to a mandatory minimum penalty to state a claim in a citizen suit.

Nor would such a requirement make sense: Even rare or *de minimis* violations can be actionable under the Clean Water Act. *Hawaii's Thousand Friends v. City and Cnty. of Honolulu*, 821 F.Supp. 1368, 1392 (D. Haw. 1993) ("The Clean Water Act imposes strict liability for NPDES violations and does not excuse 'de minimis' or 'rare' violations. Courts throughout the country have held that NPDES compliance is a matter of strict liability, and a defendant's intent and good faith are irrelevant to the liability issue"). As explained above, Plaintiffs need only allege that the District discharged effluent in amounts greater than the limitations set by the 2007 and 2014 Permits. At this point they have done that and have adequately stated a claim for relief with respect to the copper violations.

Defendant asserts that the TSOs constitute "enforcement actions" by the Regional Water Board with respect to the copper violations and that a citizen suit based on the copper violations is thus barred. This argument is largely duplicative of the Defendant's "diligent prosecution" argument on 12(b)(1) grounds, above, and there is no reason to decide the issue differently here. Plaintiffs have adequately stated a claim with respect to Defendant's alleged copper violations.

## IV.    ORDER

For the reasons set forth above, Defendant's Motion to Dismiss Plaintiffs' Complaint (ECF No. 6) is DENIED.

IT IS SO ORDERED.

Dated:   **September 23, 2015**              **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE