1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11

12   FRIENDS OF MARIPOSA CREEK, an          **Case No. 1:15-cv-00583-EPG**
     unincorporated association, and SARAH
13   WINDSOR, an individual,                **ORDER RE: PLAINTIFFS' MOTION**
                                            **FOR PARTIAL SUMMARY**
14                    Plaintiffs,           **JUDGMENT**

15        v.

16   MARIPOSA PUBLIC UTILITIES DISTRICT, a  (ECF No. 37)
     public utility district,
17

18                    Defendant.

19

20   **I.      INTRODUCTION**

21          This is an action under the Clean Water Act alleging the discharge of pollutants by a water

22   treatment facility in violation of 33 U.S.C. § 1365.  The facility, which is operated by Defendant

23   Mariposa Public Utilities District (the "District" or "Defendant"), is subject to various discharge

24   limitations listed in permits issued by the California Regional Water Quality Board, Central

25   Valley Region (the "Regional Water Board").  In particular, the permits limit the amount of

26   dichlorobromomethane ("DCBM") and copper the Facility can discharge.  Plaintiffs allege that

27   Defendant has discharged DCBM and copper in excess of these limits.

28

                                            1

Plaintiffs Friends of Mariposa Creek and Sarah Windsor (collectively, "Plaintiffs") have now moved for partial summary judgment on the issue of liability.  Specifically, Plaintiffs contend that the self-reported data submitted by the District to the California Water Resources Control Board conclusively show that the District discharged pollutants above the limitations set on it by the applicable National Pollutant Discharge Elimination System ("NPDES") permits it was operating under.  Thus, Plaintiffs argue, Defendant violated the Clean Water Act.  For the reasons described below, this Court agrees and GRANTS Plaintiffs' motion regarding liability.

## II.   BACKGROUND

### A.  Factual Background

This case revolves around the alleged discharge of pollutants by the District into Mariposa Creek.  The District owns and operates a wastewater treatment facility, located at 4956 Miller Road, Mariposa, California (the "Facility"), which discharges wastewater containing DCBM and copper into the Creek.  The District monitors the contents of the discharge from a monitoring location called "EFF-001" and self-reports its measurements to the State Water Resources Control Board.

Plaintiff Friends of Mariposa Creek ("Friends") is an organization of individuals who live in close vicinity to the Facility.  Plaintiff Sarah Windsor is a member of this organization and has lived on property that borders Mariposa Creek approximately two miles downstream from the Facility since 2001.  Friends of Mariposa Creek has approximately 20 members (including Windsor) who use Mariposa Creek for recreational and educational purposes, including fishing, wildlife observation, photography, hiking, and aesthetic enjoyment on an ongoing basis.

During the period in question, the Regional Water Board issued two NPDES Permits to regulate the pollutants discharged by the Facility.  Consistent with the terms of the Permits, the District is required to monitor and report on the amount of copper and DCBM in its discharges to the State Water Board.  Based on these self-reports, Plaintiffs allege that Defendant has been discharging pollutants in excess of the limitations imposed on it by the NPDES permits.

\\\

\\\

2

### B.  Procedural Background

On April 15, 2015, Plaintiffs filed a Complaint alleging that Defendant had violated the federal Clean Water Act on a number of occasions between December 2010 and February 2015. (ECF No. 1.)  On May 13, 2015, Defendant filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6).  (ECF No. 6.)  In that motion, Defendant contended that:  (1) a citizen suit under the Clean Water Act was precluded because the Regional Water Board was already "diligently prosecuting an action" against Defendant because it had issued two Time Scheduling Orders ("TSOs") and an Administrative Civil Liability Complaint (the "Administrative Complaint") to Defendant; and (2) the limitations set forth in the NPDES Permits were superseded by later (and more lenient) limitations set in the TSOs.  Because Defendant had complied with the limits set in the TSOs, which Defendant argued were the applicable limits (rather than those set by the Permits), Defendant asserted that the Facility had not violated the Clean Water Act.  That motion was denied in its entirety on September 24, 2015.  (ECF No. 22.) In so doing, the Court found that, among other things, that:  (1) the TSOs and the Administrative Complaint did not constitute "diligent prosecution" under the Clean Water Act; and (2) the limitations set in the TSOs did not supersede the final limitations set by the NPDES Permits.

Defendant then filed a second Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(7) on October 8, 2015.  (ECF No. 23.)  In its second motion to dismiss, Defendant argued that the Court had rendered the TSOs and Administrative Complaint invalid and that, as a result, the Regional Water Board was an indispensable party to the litigation because it would need to defend the validity of the TSOs and the Administrative Complaint.  Because the Regional Water Board enjoyed sovereign immunity, Defendant reasoned, such joinder was impossible and the case must be dismissed.  That motion was also denied in its entirety.  (ECF No. 31.)  Defendant answered the Complaint on December 14, 2015.  (ECF No. 32.)

On February 26, 2016, Plaintiffs filed a Motion for Partial Summary Judgment as to the issue of liability.  (ECF No. 37.)  Plaintiffs ask the Court to determine, based on the undisputed facts in the case, that the District has violated the Clean Water Act.  Plaintiffs do not ask the

1    Court to determine the amount of penalties to be assessed, assuming such liability is found.

2    Plaintiffs attach the following evidence in support of their motion:

3    • Declaration of Sarah Windsor ("Windsor Decl.");

4    • A photograph of Mariposa Creek;

5    • Declaration of Douglas Chermak ("Chermak Decl.");

6    • Computer printout of data obtained from the State Water Quality Control Board's
7      California Integrated Water Quality Program website;

8    • Copies of Defendant's Self-Monitoring Reports maintained by the Regional Water
       Board for June 2010 through November 2010;

9    • A copy of the NPDES Permit No. CA 0079430, State Board Order No. R5-2007-0171,
10     issued on December 6, 2007 (the "2007 Permit"); and,

11   • A copy of the NPDES Permit No. CA 0079430, State Board Order No. R5-2014-0042,
       issued on March 28, 2014 (the "2014 Permit").

12   On March 11, 2016, Defendant filed an Opposition to Plaintiffs' Motion and attached the

13   following evidence in support:

14   • Declaration of Neal Constanzo ("Constanzo Decl.");

15   • Excerpts from the transcript of the deposition of Sarah Windsor;

16   • A letter from the Friends of Mariposa Creek to Aide Ortiz of the Regional Water
17     Board, dated February 16, 2014;

18   • Declaration of Mark Rowney, the General Manager of the District ("Rowney Decl.");

19   • A topographical map of the town of Mariposa (and surrounding area);

20   • A copy of Time Scheduling Order No. R5-2011-0905, issued by the Regional Water
       Board and dated July 13, 2011 (the "2011 TSO");

21   • A copy of the Notice of Violation, issued by the Regional Water Board on September
22     19, 2013;

23   • A letter from the District to the Regional Water Board, dated October 7, 2013;

24   • A copy of Administrative Civil Liability Complaint No. R5-2013-0590, issued by the
       Regional Water Board on December 30, 2013 (the "Administrative Complaint");

25   • An unsigned copy of the Proposed Settlement Agreement and Stipulation for Entry of
26     Administrative Civil Liability Order, dated March 2, 2016;

27   • A copy of Time Scheduling Order NO. R5-2014-0043, issued by the Regional Water
       Board and dated March 28, 2014 (the "2014 TSO");

28

4

1      • A copy of a Complaint Inspection Report (with cover letter) prepared by the Regional
Water Board, dated April 14, 2011; and,

2      • A copy of a Memorandum of Agreement between the United States Environmental
Protection Agency and the California State Water Resources Control Board, dated

3      September 22, 1989.

4      On March 18, 2016, Plaintiffs filed a Reply Brief in Support of the Motion and attached a

5      supplemental declaration by Douglas Chermak, along with three screenshots of the California

6      Integrated Water Quality System Project website.

7      After reviewing the papers submitted in support and opposition of the Motion, the Court

8      determined that this matter is suitable for decision without oral argument pursuant to Local Rule

9      230(g).  Based on the pleadings and for the reasons set forth below, Plaintiffs' Motion is

10     GRANTED.

11     **III.    LEGAL STANDARDS**

12     **A. Summary Judgment**

13     Summary judgment is appropriate where "the movant shows that there is no genuine

14     dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

15     Civ. P. 56(a).  A genuine dispute exists if "the evidence is such that a reasonable jury could return

16     a verdict for the nonmoving party" and material facts are those "that might affect the outcome of

17     the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

18     "As the party with the burden of persuasion at trial, [Plaintiffs] must establish 'beyond

19     controversy every essential element of'" their claims.  *S. Cal. Gas Co. v. City of Santa Ana*, 336

20     F.3d 885, 888 (9th Cir. 2003).  "Once the moving party meets its initial burden, the non-moving

21     party must 'go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to

22     interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

23     issue for trial.''"  *Burch v. Regents of Univ. of Cal.*, 433 F.Supp.2d 1110, 1125 (E.D. Cal. 2006),

24     *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "[T]he inferences to be drawn from

25     the underlying facts . . . must be viewed in the light most favorable to the party opposing the

26     motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

27     "A party opposing summary judgment must direct our attention to specific, triable facts."

28     *S. Cal Gas Co.*, 336 F.3d at 889.  The court "is not required to comb the record to find some

reason to deny a motion for summary judgment." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988). "On a summary judgment motion, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.*, *quoting Liberty Lobby, Inc.*, 477 U.S. at 1413.

### B. The Clean Water Act

As the Court previously explained in its order denying the District's first motion to dismiss:

> The Clean Water Act "makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 52 (1987). To regulate these discharges, the Act empowers the Environmental Protection Agency to issue permits authorizing the release "of pollutants in accordance with specified conditions." *Id., citing* 33 U.S.C. § 1342(a). Alternatively, states may administer their own permit programs, provided that those programs are run in accordance with federal guidelines. *Id.* If a permit is issued and the permit holder fails to abide by the conditions in the permit, the permit holder may find itself subject to an enforcement action by the applicable state agency. Such an enforcement action can include the possibility of "administrative, civil, and criminal sanctions." *Id.* at 53, *citing* 33 U.S.C. § 1319. Should the agency fail to enforce the guidelines, "private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." *Id.*, *citing* 33 U.S.C. § 1365(a)(1). A private citizen that prevails in an action under § 1365 may be entitled to "injunctive relief and/or civil penalties." *Id.*

(ECF No. 22.)

"[A] permittee violates the [Clean Water Act] when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms." *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013), *citing Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1138 (9th Cir. 1998); 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action."). A private citizen suit can be brought "against any person alleged to be in violation of federal pollution control requirements." *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1012 (9th Cir. 2002). Permittees are strictly liable for violations of their permits under the Clean Water Act. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 919 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City and Cnty. of Honolulu*, 821 F.Supp. 1368, 1392 (D. Haw.

1   1993) ("Courts throughout the country have held that NPDES compliance is a matter of strict

2   liability, and a defendant's intent and good faith are irrelevant to the liability issue."); *Oregon*

3   *State Public Interest Research Group, Inc. v. Pacific Coast Seafoods Co.*, 361 F.Supp.2d 1232,

4   1240 (D. Or. 2005) ("The defendant's good faith or reference to data reporting errors is irrelevant

5   to establishing civil liability.").  Thus, to establish a violation of the Clean Water Act, "Plaintiffs

6   need only prove that Defendants violated the terms and conditions of their NPDES permit."

7   *Wishtoyo Found. v. Magic Mountain LLC*, No. CV 12-05600 GAF (MANx), 2014 WL 6841554,

8   at *5 (C.D. Cal. Dec. 3, 2014).

9   **IV.    DISCUSSION**

10   **A. Plaintiffs Have Established Standing to Pursue Their Claims**

11          As an initial matter, Defendant contends that Windsor and the Friends of Mariposa Creek

12   lack standing because the harm that Windsor alleges is solely conjectural and she has not

13   demonstrated actual environmental harm to Mariposa Creek.  In particular, Defendant argues that

14   "[i]t is the reality of the threat of impending injury that is relevant to the standing inquiry, not

15   Plaintiff's subjective apprehensions," that is required to demonstrate that Plaintiff has suffered a

16   remediable injury.  (Memorandum of Points and Authorities in Opposition to Plaintiff's Motion

17   for Partial Summary Judgment ("Opposition Brief") 15:1-2, ECF No. 43 ("Windsor never

18   explains how the pollution or effects of it in the creek that she claims to have observed is in any

19   way connected with Defendant's discharge of DCBM").)  A substantial part of its argument is

20   premised on the statements offered by Mark Rowney in his declaration, which argue that the

21   Facility's discharges have not made the creek toxic or brought it out of compliance with drinking

22   water standards.  Put simply, the District asserts that Windsor must show a substantiated scientific

23   link between the discharge of a pollutant and "adverse health and environmental effects" in the

24   creek to demonstrate that she has standing.  *Id.* at 14:10-28.

25          **1.  *Plaintiff Sarah Windsor has standing.***

26          To demonstrate standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that

27   is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

28   the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  An "injury in fact" is shown "if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). The Clean Water Act's "citizen suit provision extends standing to the outer boundaries set by the 'case or controversy' requirement of Article III of the Constitution." *Id.*, *citing Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981).  Importantly, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181 ("To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit.").

In *Laidlaw*, for instance, a plaintiff demonstrated standing by stating in an affidavit that "she lived two miles from the facility; that before Laidlaw opened the facility, she picnicked, walked, birdwatched, and waded in an along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges." *Id.* at 182.   A different plaintiff showed standing by submitting an affidavit that stated "that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because was concerned that the water contained harmful pollutants." *Id.*  at 183.

Windsor has submitted a declaration attesting to facts establishing her standing under penalty of perjury.  She has stated that: (1) she lives on property adjoining Mariposa Creek; (2) she uses Mariposa Creek for recreational and educational enjoyment, including photography, hiking, wildlife observation, and swimming; (3) she is concerned about the Facility's discharge of DCBM and copper into Mariposa Creek; and (4) she has reduced her use of Mariposa Creek because of these discharges.  (Windsor Decl. ¶¶ 10, 12, 13, ECF No. 39; Constanzo Decl., Exh. A

1  19:2-5, 21:2-22:4, ECF No. 42.)  Windsor's concerns would be alleviated if the Facility stopped

2  its polluted discharges.  *Id.* at ¶¶ 13, 14, 15.

3        Plaintiff has also demonstrated that the second and third requirements of standing are met.

4  Plaintiff Windsor lives downstream from the Facility and her enjoyment of the creek is

5  diminished because of the District's alleged violations of the Clean Water Act.  *Id.* at ¶ 10.  Thus,

6  the causation element is met.  *Ecological Rights Found.*, 230 F.3d at 1152.  The Plaintiffs also ask

7  for injunctive relief, which establishes the redressability requirement of standing.  *Natural*

8  *Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000).

9  Windsor has thus demonstrated standing.

10           ***2.   The Windsor declaration is admissible evidence.***

11       The District has objected to Windsor's statements in her declaration because the

12  declaration: (1) states conclusions for which Windsor lacks personal knowledge; (2) includes

13  evidence that constitutes hearsay; and (3) includes statements that are contradicted by Sarah

14  Windsor's deposition testimony.

15       The District objects to Windsor's statements on the basis that she lacks personal

16  knowledge.  In particular, the District objects to Windsor's statements about the history,

17  composition, and activities of the Friends of Mariposa Creek.  The District's objection is

18  overruled.  "A witness may testify to a matter only if evidence is introduced sufficient to support

19  a finding that the witness has personal knowledge of the matter.  Evidence to prove personal

20  knowledge may consist of the witness's own testimony."  Fed. R. Evid. 602.  Windsor's

21  declaration states that she is a founding and current member of the Friends of Mariposa Creek.  It

22  is well within her personal knowledge to testify to the history, composition, and activities of that

23  organization.  *Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1155 (9th Cir. 2000) (holding

24  position as Director of Human Resources adequate to establish personal knowledge of employee

25  insurance plans); *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1201 (C.D. Cal. 2007)

26  ("Personal knowledge can be inferred from a declarant's position within a company or business"),

27  *citing In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2000).

28

1    The District levels hearsay objections to Windsor's statements that: (1) the Friends of

2    Mariposa Creek delegated authority to her to initiate the present legal action; and (2) the Friends

3    of Mariposa Creek investigated and found that the District had failed to comply with the 2007 and

4    2014 Permits.  But neither statement is offered for a hearsay purpose (*i.e.*, for the truth of the

5    matter asserted); they are offered merely to explain Windsor's motivation to pursue a future

6    course of conduct (to initiate legal action in the first case and to investigate the source of

7    pollutants in the second case).  *See* Fed. R. Evid. 801(c)(2);  *Suggs v. Stanley*, 324 F.3d 672, 681

8    (8th Cir. 2003) (out of court statement not hearsay when offered to explain what prompted

9    listener's investigation).  Nor, for that matter, are they necessarily statements at all—they appear

10   to be actions (*i.e.*, the delegation of authority and the performance of an investigation).  To the

11   extent these statements are relevant for this Motion, the District's objection is overruled.

12           Finally, the District objects to Windsor's statement that the Friends of Mariposa Creek

13   found that the District had "failed to comply with the terms of" of the 2007 and 2014 Permits

14   because Windsor stated at her deposition that she did not know whether the Permits set a limit as

15   to the amount of DCBM that could be discharged by the District.  It is true that, in some cases, "a

16   party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."

17   *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  However, this "sham

18   affidavit rule . . . does not automatically dispose of every case in which a contradictory affidavit

19   is introduced to explain portions of earlier deposition testimony."  *Van Asdale v. Int'l Game

20   Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  To justify the striking of an affidavit, "the

21   inconsistency between the party's deposition testimony and subsequent affidavit must be clear

22   and unambiguous."  *Id.*

23           The contradiction in this instance is not clear and unambiguous.  Windsor initially

24   testified in deposition that she did not know whether the Permits set "a limit on the amount of

25   DCBM that can be included in what is discharged in to the creek."  (Constanzo Decl., Exh. A

26   38:19-23, ECF No. 42.)  She clarified shortly thereafter, however, that she did know that there

27   were limits—she simply didn't know how to interpret those limits.  *Id.* at 39:16-22 ("Q. So as I

28   understand you, ma'am, you don't know one way or another whether or not there is any limitation

1    on the concentration of either copper or DCBM in any effluent discharge from the wastewater

2    treatment plant, do you? A. It's my understanding there are established limits. I'm not a scientist.

3    I don't know how to interpret those limitations."). The District's objection is overruled.

4               *3.  Plaintiffs need not show actual harm to show standing.*

5         Defendant does not offer any contrary evidence to show that Windsor has not suffered an

6    injury in fact.  Rather, it contends that Windsor has not demonstrated that the pollutants

7    discharged by the Facility have caused actual harm to Mariposa Creek.  In support of this

8    proposition, the District offers, in the form of the Rowney Decl., the suggestion that neither

9    DCBM nor copper would cause the harms of which Windsor complains.

10        But "the threshold question of citizen standing under the [Clean Water Act] is whether an

11   individual can show that *she* has been injured in her use of a particular area because of concerns

12   about violations of environmental laws, not whether the plaintiff can show there has been actual

13   environmental harm." *Ecological Rights Found.*, 230 F.3d at 1151 (emphasis in original).

14   Indeed, "harm to the environment need not ever be proved; the Clean Water Act allows citizen

15   suits based on violations of any conditions of an NPDES permit, even those which are purely

16   procedural." *Id.* ("requiring a plaintiff to demonstrate actual environmental harm in order to

17   obtain standing would, in many Clean Water Act lawsuits, compel the plaintiff to prove more to

18   show standing than she would have to prove to succeed on the merits.").

19        Furthermore, the case upon which the District relies to support its proposition that

20   Plaintiffs must demonstrate actual environmental degradation in fact states precisely the opposite.

21   In *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000), the

22   Fourth Circuit Court of Appeals considered a district court order that rejected a claim of standing

23   because plaintiffs had not presented evidence demonstrating: "(1) the chemical content of the

24   waterways affected by the defendant's facility; (2) any increase in the salinity of the waterways;

25   and (3) other negative change in the ecosystem of the waterway." *Id.* at 159.  The court rejected

26   that requirement, finding that it was inconsistent with *Laidlaw*.  *Id* ("The Court required no

27   evidence of actual harm to the waterway.").

28

1    Surveying the case law, the court also found that no circuit has "required additional

2    scientific proof where there was a direct nexus between the claimant and the area of

3    environmental impairment."  *Id.*, *citing Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*

4    *Inc.*, 73 F.3d 546, 556 (5th Cir. 1996) (standing shown where "affiants expressed fear that the

5    discharge . . . will impair their enjoyment of these activities because these activities are dependent

6    upon good water quality"); *U.S. v. Metro. St. Louis Sewer Dist.*, 883 F.2d 54, 56 (8th Cir. 1989)

7    ("Missouri Coalition and two of its named members allege that many of the 25,000 members

8    visit, cross, and frequently observe the bodies of water identified in the United States' complaint

9    and that from time to time these members use these waters for recreational purposes. They also

10   allege that these interests are adversely affected by the pollution of these waters. These

11   allegations are sufficient to give the Coalition and its members constitutional standing"); *Friends*

12   *of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 61 (2d Cir. 1985) ("Affiant Richard Endreny

13   averred that his children swim in the river, his son occasionally fishes in the river and his family

14   has and will continue to picnic along the river. These allegations are sufficient to show the injury

15   in fact required by *Morton* and *SCM*").  The court concluded that plaintiff did not need to show

16   "environmental degradation to show injury in fact":

17       Threatened environmental injury is by nature probabilistic . . . [i]n this case,
         Gaston Copper's alleged permit violations threaten the waters within the
18       acknowledged range of its discharge, including the lake on the Shealy's property.
         By producing evidence that Gaston Copper is polluting Shealy's nearby water
19       source, CLEAN has shown an increased risk to its member's downstream uses.
         This threatened injury is sufficient to provide injury in fact. Shealy need not wait
20       until his lake becomes barren and sterile or assumes an unpleasant color and smell
         before he can invoke the protections of the Clean Water Act. Such a novel
21       demand would eliminate the claims of those who are directly threatened but not
         yet engulfed by an unlawful discharge. Article III does not bar such concrete
22       disputes from court.

23   *Id.* at 160.

24   Thus, the District's contention that Windsor does not have standing to pursue this case is

25   incorrect.  Rowney's statements that no environmental harm has occurred are immaterial to the

26   question of standing because no showing of environmental harm is required.  At the point that

27   Windsor has demonstrated that she: (1) is in close geographical proximity to the creek; (2) enjoys

28   some aesthetic or recreational use of the creek; and (3) has curtailed those uses because of

1    concerns about the discharged pollutants, she has adequately stated a basis for standing. *Laidlaw*,

2    528 U.S. at 184 ("we see nothing 'improbable' about the proposition that a company's continuous

3    and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail

4    their recreational use of that waterway and would subject them to other economic and aesthetic

5    harms.").  Those three facts are undisputed based on the evidence presented to the Court.

6           Nor does the District's assertion that Windsor's deposition testimony contradicts her

7    declaration on this point hold up to scrutiny.  While it is true that Windsor conceded that she did

8    not understand the particular mechanism of the effects that DCBM or copper have on overall

9    water quality, nothing suggests that a plaintiff needs to understand the chemical or biological

10   interactions occurring within a waterway to state standing under the Clean Water Act.  In fact,

11   even Windsor's "mere subjective apprehensions," which the District contends are not well-

12   founded, are enough to find standing. *Ecological Rights Found.*, 230 F.3d at 1150 ("[a]esthetic

13   and environmental well-being, like economic well-being, are important ingredients of the quality

14   of life in our society. Yet, aesthetic perceptions are necessarily personal and subjective, and

15   different individuals who use the same area for recreational purposes may participate in widely

16   varying activities, according to different schedules. *Laidlaw* confirms that the constitutional law

17   of standing so recognizes, and does not prescribe any particular formula for establishing a

18   sufficiently 'concrete and particularized' aesthetic or recreational injury-in-fact.").  The mere fact

19   that Windsor cannot explain in a deposition the precise science linking the discharge of DCBM

20   and copper to environmental harm does not mean that she lacks standing to pursue a claim under

21   the Clean Water Act.

22          As explained above, Windsor has standing to pursue her Clean Water Act claims.

23   Because Windsor has standing, the Court need not consider the District's arguments with

24   response to the Friends of Mariposa Creek's standing.  *Watt v. Energy Action Educ. Found.*, 454

25   U.S. 151, 160 (1981), *citing Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

26   252, 263-64 (1977) (finding that where one individual plaintiff had standing, the court "need not

27   consider whether the other individual and corporate plaintiffs have standing to maintain the suit").

28

1    The Court finds that Plaintiffs have submitted undisputed evidence establishing standing to

2    pursue their claims.

3        **B.  The Scope of the NPDES Permits**

4        As noted above, "a permittee violates the [Clean Water Act] when it discharges pollutants

5    in excess of the levels specified in the permit, or where the permittee otherwise violates the

6    permit's terms." *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013); 40 C.F.R.

7    § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act and is

8    grounds for enforcement action.").  Plaintiffs ask the Court to take judicial notice of two

9    documents maintained by the Regional Water Board: (1) Order No. R5-2007-0171 NPDES

10   Permit No. CA 0079430, issued on December 6, 2007 (the "2007 Permit"); and (2) Order No. R5-

11   2014-0042 NPDES Permit No. CA 0079430, issued on March 28, 2014 (the "2014 Permit").

12   Defendant does not object to this request.  Courts may take judicial notice of facts "not subject to

13   reasonable dispute" when they are either: "(1) generally known within the territorial jurisdiction

14   of the trial court or (2) capable of accurate and ready determination by resort to sources whose

15   accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  The Court takes judicial notice of

16   the requested documents. *U.S. v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011) (courts

17   may "take judicial notice of 'matters of public record'").

18       The 2007 and 2014 Permits set forth the following final effluent limitations with respect

19   to DCBM and copper:

20

|  | **Average Monthly** | **Maximum Daily** |
|---|---|---|
| **2007 Permit** | | |
| **DCBM** | 0.6 µg/L | 1.1 µg/L |
| **Copper** | 6.1 µg/L | 12.3 µg/L |
| **2014 Permit** | | |
| **DCBM** | 0.56 µg/L | 1.3 µg/L |
| **Copper** | 6.8 µg/L | N/A |

27       *1.  Interpreting the Permits.*

28

Defendant contends that additional discovery is required, pursuant to Federal Rule of Civil Procedure 56(d), to determine what effluent limitations it was required to comply with.  In particular, Defendant argues that the language in the permits is ambiguous with respect to the final effluent limitations and that extrinsic evidence in the form of the TSOs and the intent of the parties should be admissible to explain the Permit limitations.

"[NPDES permit] terms are to be given their ordinary meaning, and when the terms of a [permit] are clear, the intent of the parties must be ascertained from the [permit] itself."  *NRDC v. Cnty. of L.A.*, 725 F.3d 1194, 1205 (9th Cir. 2013) (interpreting NPDES permit issued to county defendants), *citing Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. Whenever possible, the plain language of the contract should be considered first."). "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Patterson*, 204 F.3d at 1210.  "'[A] court must give effect to every word or term' in an NPDES permit 'and reject none as meaningless or surplusage.'"  *NRDC*, 725 F.3d at 1206, *quoting In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001).

The plain language of the 2007 Permit, in relevant part, states that "[t]he discharge by the Mariposa Public Utility District from the discharge point identified below is subject to waste discharge requirements as set forth in this Order."  (Request for Judicial Notice, Exh. A, pg. 2, ECF No. 38-1.)  It then proceeds to explain that:  "Except for interim periods when any of the following parameters have an interim effluent limitation in effect (see subsection 2.a and 2.b, below) the Discharger shall maintain compliance with the following effluent limitations." *Id*. at 12.  The referenced subsections then set forth a specific interim period (ending on May 17, 2010) with specific interim limitations.  None of the violations alleged by Plaintiffs fall within this interim period and no blanket or open-ended reference is made to potential future "interim periods."  The 2007 Permit then lays out the final effluent limitations as described above.

1    The 2014 Permit contains similar language.  It begins by stating that "[t]he following

2  Discharger is subject to waste discharge requirements (WDRs) set forth in this Order."  (Request

3  for Judicial Notice, Exh. B, pg. 2, ECF No. 38-2.)  It then explains that "[t]he Discharger shall

4  maintain compliance with the following effluent limitations at Discharge Point 001, with

5  compliance measured at Monitoring Location EFF-001 as described in the Monitoring and

6  Reporting Program, Attachment E."  *Id*. at 5.  The 2014 Permit then sets out a table listing the

7  final effluent limitations as laid out in the above chart.

8    Neither of these Permits offer language that reasonable people could find susceptible to

9  multiple interpretations.  Both Permits explain that they are designed to set waste discharge

10  limitations on the Facility and give precise numerical values describing those limitations.  They

11  both also use mandatory, rather than permissive language—the Facility "shall" comply with the

12  listed limitations—and only offer limited, specific carve out periods and circumstances under

13  which the Facility need not meet the final effluent limitations.  The language of the Permits is

14  thus clear and unambiguous.

15    Likewise, the terms of the Permits explicitly reference and match up with similar language

16  in the Clean Water Act.  They explain, for instance, that they are "issued pursuant to section 402

17  of the federal Clean Water Act" and each "shall serve as a NPDES permit for point source

18  discharges from this facility to surface waters."  (Request for Judicial Notice, Exh. A, pg. 5, ECF

19  No. 38-1; Exh. B, pg. 4, ECF No. 38-2.)  The referenced section of the Clean Water Act explains

20  the parameters by which the EPA or a state agency may "issue a permit for the discharge of any

21  pollutant, or combination of pollutants."  33 U.S.C. § 1342(a)(1).  The relevant statutes thus

22  anticipate that the regulation of point source discharges will occur within an NPDES permit.

23    ***2.  Interpreting the TSOs.***

24    Defendants contend that the TSOs should be read as part of the Permits and that the

25  interim effluent limitations within the TSOs thus superseded the final effluent limitations in the

26  Permits.  The 2011 TSO, which was issued by the Regional Water Board on July 13, 2011, is

27  labeled:

28    TIME SCHEDULE ORDER R5-2011-0905

1      REQUIRING THE MARIPOSA PUBLIC UTITLIY DISTRICT WASTEWATER

2                        TREATMENT FACILITY

3                         MARIPOSA COUNTY

4      TO COMPLY WITH REQUIREMENTS PRESCRIBED IN ORDER R5-2007-0171

5                   (NPDES PERMIT NO. CA0079430)

6   (Rowney Decl., Exh. B, pg. 6, ECF No. 45-1.)  It cites California Water Code § 13300, which

7   states:

8           Whenever a regional board finds that a discharge of waste is taking place or
            threatening to take place that violates or will violate requirements prescribed by
9           the regional board, or the state board, or that the waste collection, treatment or
            disposal facilities of a discharger are approaching capacity, the board may require
10          the discharger to submit for approval of the board, with such modifications as it
            may deem necessary, a detailed time schedule of specific actions the discharger
            shall take in order to correct or prevent a violation of requirements.

11  *Id*.

12          The 2011 TSO also explained that, under the California Water Code, the Regional Water

13  Board was required to impose minimum penalties when a discharger violates effluent limitations,

14  unless "the waste discharge is in compliance with either a cease and desist order . . . or a time

15  schedule order."  *Id*. at 7.  After noting that the Facility was not complying with the final effluent

16  limitations set forth in the 2007 Permit, the 2011 TSO determined that the District should be

17  required to prepare and implement a pollution prevention plan.  It also laid out a set of "interim

18  effluent limitations" that were more lenient than the final effluent limitations in the 2007 Permit.

19  *Id*. at 9.  It explained that the intent of the interim effluent limitations was to assist the District in

20  setting a schedule to bring the Facility into compliance with the final effluent limitations:

21
22          The Discharger can, in addition to other treatment and control options, undertake
            source control to maintain compliance with the interim effluent limitations in this
23          Order. Interim effluent limitations are established when compliance with the final
            effluent limitations cannot be achieved by the existing discharge. Discharge of
24          constituents in concentrations in excess of the final effluent limitations, but in
            compliance with the interim effluent limitations, can significantly degrade water
25          quality, and adversely affect the beneficial uses of the receiving stream on a long-
            term basis. The interim effluent limitations, however, establish an enforceable
26          ceiling concentration until compliance with the final effluent limitations can be
            achieved.

27  *Id.* at 9; *see also id*. at 10 ("The Discharger shall comply with the following time schedule to

28  ensure compliance with the final effluent limitations for dichlorobromomethane.").  The TSO

                                        17

1   concluded that "[i]ssuance of this Order does not preclude the Central Valley Water Board from

2   taking additional enforcement actions against the Discharger." *Id.* at 11.

3        The 2014 TSO, which was issued on March 28, 2014, uses similar language.  It explains

4   that its purpose is to "provide[ ] time schedules for completing the actions necessary to ensure

5   compliance with the final effluent limitations."  (Rowney Decl., Exh. G, pg. 26, ECF No. 45-2.)

6   It again set interim effluent limitations that were more lenient than the final effluent limitations in

7   the 2014 Permit.  And it explained that the interim effluent limitations were intended to help bring

8   the Facility into compliance with the final effluent limitations:

> 9   The Central Valley Water Board finds that the Discharger can maintain
> compliance with the interim effluent limitations included in this Order. Interim
> 10   effluent limitations are established when compliance with the final effluent
> limitations cannot be achieved by the existing Facility. Discharge of constituents
> 11   in concentrations in excess of the final effluent limitations, but in compliance with
> the interim effluent limitations, can significantly degrade water quality and
> 12   adversely affect the beneficial uses of the receiving stream on a long-term basis.
> The interim effluent limitations, however, establish an enforceable ceiling
> 13   concentration until compliance with the final effluent limitations can be achieved.

14   *Id.* at 26.  Like the 2011 TSO, the 2014 TSO also reserved the right of the Regional

15   Water Board to take enforcement action for violation of the final effluent limitations.

16        Nothing in the TSOs indicate that they were intended to supplant or replace the

17   Permits or the final effluent limitations indicated in the Permits.  Rather, the TSOs make

18   clear that the interim effluent limitations are merely setting a compliance schedule to

19   bring the Facility into compliance with the final effluent limitations.  The TSOs also

20   discuss the fact that the implementation of the TSOs freed the Regional Water Board

21   from a mandatory obligation to impose penalties for the Facility's violations.  Nothing in

22   the plain language of these documents indicates that they are permits.  On the contrary,

23   they repeatedly refer in a distinguishing way to the final limitations in the actual permits.

24   Further discovery is not necessary to ascertain the objective intent of the Regional Water

25   Board in light of the unambiguous language.

26        Binding case law supports this interpretation.  In *Citizens for a Better*

27   *Environment—California v. Union Oil Company of California*, 83 F.3d 1111 (9th Cir.

28   1996), for example, defendant entered into a settlement agreement which included a

1  consent order. The consent order included a term that relieved defendant from meeting a

2  discharge limitation in its NPDES permit until a date later than the date set by the permit.

3  In the ensuing citizen suit, defendant argued that the consent order had the effect of

4  modifying the compliance date set by the permit. The court concluded that the order did

5  not modify the permit. *Id*. at 1119 ("The Court further concludes that the CDO at issue

6  did not modify, effectively or otherwise, the terms of UNOCAL's NPDES permit.").

7    As in the present case, the express terms of the consent order there indicated that

8  the Water Board "did not intend to modify the Permit but instead worked out a

9  compliance schedule" with which defendant could comply. *Id.* at 1120.  The Ninth

10  Circuit held that such a schedule was a mere "exercise of prosecutorial discretion" by

11  which the Water Board elected not to pursue actual violations of the permit because the

12  consent order reserved the right to "pursue appropriate action against the dischargers."

13  *Id.*  Specifically, the consent order said that if "the dischargers have failed to comply with

14  the provisions of this Order [the official may] . . . request the Attorney General to take

15  appropriate action against the dischargers, including injunctive and civil remedies, if

16  appropriate, or to issue a complaint for Board consideration of Administrative Civil

17  Liabilities." *Id.*

18    The Court thus concludes that the TSOs are not permits as meant by the Clean

19  Water Act and did not amend or modify the final effluent limitations listed in the 2007

20  and 2014 Permits. *Riverkeeper, Inc. v. Mirant Lovett, LLC,* 675 F.Supp.2d 337, 345

21  (S.D.N.Y. 2009) ("Settlements that merely provide for selective non-enforcement of

22  permits by a state regulatory agency, without more, do not bar citizen suits under the

23  CWA seeking enforcement of the terms of such permits."); *Frilling v. Village of Anna*,

24  924 F.Supp. 821, 844 (S.D. Ohio 1996) ("This Court is simply not authorized to defer to

25  the State's discretion in certain, select cases by denying citizens their right to enforce

26  NPDES permit limitations where the government has failed to do so . . . the Consent

27  Order entered into by the parties did *not* suspend the legal effect of the NPDES

28  limitations.").

1    The Court finds that the undisputed facts establish that the 2007 and 2014 Permits

2    provided the above final effluent limitations and that Defendant was required to comply

3    with those limitations.

4    **C. Defendant Discharged Pollutants in Excess of the Final Effluent Limitations**

5    As explained above, "a permittee violates the [Clean Water Act] when it discharges

6    pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates

7    the permit's terms." *NRDC v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013); 40

8    C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean Water Act

9    and is grounds for enforcement action."). "A monitoring report that shows a water sample with

10   pollutant discharges in excess of permit limits is conclusive evidence of a violation." *San*

11   *Francisco Baykeeper v. West Bay Sanitary Dist.*, 791 F.Supp.2d 719, 755 (N.D. Cal. 2011),

12   *quoting Inland Empire Waterkeeper v. Uniweb, Inc.*, No. ED CV 07-00480 DDP (FMOx), 2008

13   WL 6098645, at *26 (C.D. Cal. Aug. 6, 2008).

14   The District submitted such reports and the results of those reports are summarized by

15   Plaintiff in the Chermak Declaration.  The District did not file separate objections to the Chermak

16   Declaration.  In its response to Plaintiff's Statement of Undisputed Facts, however, the District

17   objects to the summary of the reports, asserting that it is not properly authenticated and

18   constitutes hearsay evidence.

19   In general, "[e]vidence describing a process or system used to produce a result and

20   showing that process or system produces an accurate result" is an appropriate way to authenticate

21   a printout of computer data.  Fed. R. Evid. 901(b)(9); *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas.*

22   *Co.*, 576 F.3d 1040, 1045 (9th Cir. 2009) (system user testimony as to "the process of inputting

23   data into the computer and the process of querying the computer to compile the information to

24   create the summaries" adequate to authenticate records).  The Chermak Decl. accomplishes this

25   task by explaining: (1) how the information is submitted to the computerized system; and, (2) the

26   specific steps the declarant went through to obtain the information from the system.

27   Nor does the chart constitute inadmissible hearsay evidence.  "A record or statement of a

28   public office" is admissible hearsay if it sets out "a matter observed while under a legal duty to

report" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).  As the Chermak Decl. explains, the information contained in the chart was reported pursuant to the legal requirements imposed by the 2007 and 2014 Permits and the District does not lay out any basis to suspect the document's trustworthiness.  The chart is thus admissible and the objection is overruled.[1]

Where the District's reports indicate discharges in excess of the limitations provided in the 2007 or 2014 Permits (as applicable), the evidence establishes a violation of the Clean Water Act.  Defendant has not submitted any evidence to counter Plaintiff's evidence of its discharges and there no dispute that the level of pollutants discharged by Plaintiff exceeded the final effluent limitations provided by the Permits.

Defendant again contends that the interim effluent limitations provided in the TSOs should be the governing limitations.  Thus, it argues, it is not liable because it was in compliance with the interim effluent limitations, even if it was not in compliance with the final effluent limitations.  As discussed above, however, the 2007 and 2014 Permits establish the standards by which Defendant's conduct must be measured.  *Citizens for a Better Environment—California v. Union Oil Company of California*, 83 F.3d 1111, 1120 (9th Cir. 1996); *Riverkeeper, Inc. v. Mirant Lovett, LLC,* 675 F.Supp.2d 337, 345 (S.D.N.Y. 2009); *Frilling v. Village of Anna*, 924 F.Supp. 821, 844 (S.D. Ohio 1996).  Based on the evidence in the record, Plaintiffs have shown that there is no material dispute of fact that Defendant has discharged pollutants beyond the amounts allowed in the 2007 and 2014 Permits.[2]

Plaintiffs also request that the Court make a specific finding as to the number of violations for which the District is liable.  Typically, "a violation of a monthly average will be counted as a violation of every day of the month."  *Sierra Club v. City & Cnty. of Honolulu*, 486 F.Supp.2d

---

[1] And, in any event, the Court must focus on the admissibility of a document's contents, rather than its form, at the summary judgment stage.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  In other words, a statement or document that constitutes hearsay, as submitted, may be considered at summary judgment if the information it contains could be introduced at trial in a non-hearsay form (through witness testimony, for example).

[2] The Court notes, however, that "any good-faith efforts to comply with the applicable requirements," even if those efforts were erroneously based on the interim effluent limitations, rather than the final effluent limitations, may be a mitigating factor in determining the amount of the civil penalty to be imposed.  While the TSOs do not introduce a material dispute of fact into the question of liability, therefore, they, along with other facts raised by Defendant in opposition to this Motion, may be relevant in the penalty phase of this litigation.  33 U.S.C. § 1319(d).

1185, 1190-1191 (D. Haw. 2007).  Plaintiffs argue that there have been a total of 2,219 violations by the District.  (Motion 14:24-15:1, ECF No. 37-1.)  This number was reached by adding the following figures:

| | |
|---|---|
| Number of days in months the District exceeded average monthly effluent limitation for DCBM in the 2007 Permit | 1,308 |
| Number of days in months the District exceeded average monthly effluent limitation for DCBM in the 2014 Permit | 640 |
| Number of days the District exceeded the daily maximum limitation for DCBM in the 2007 Permit | 39 |
| Number of days the District exceeded the daily maximum limitation for DCBM in the 2014 Permit | 21 |
| Number of days in months the District exceeded average monthly effluent limitation for total recoverable copper in the 2007 Permit | 182[3] |
| Number of days in months the District exceeded average monthly effluent limitation for total recoverable copper in the 2014 Permit | 28 |
| **Total number of violations** | **2,218** |

The Court has verified these numbers and finds, based on the undisputed facts of this case, that the District is liable for 2,218 separate violations of its obligations under the 2007 and 2014 Permits (and thus, the Clean Water Act).

### D.  The Regional Water Board's Actions Do Not Strip the Court of Jurisdiction

Finally, the District argues that the Regional Water Board has recently provided notice of a proposed settlement agreement that would cover some of the violations that Plaintiffs allege. This appears to be a renewal of the argument Defendant made in its first motion to dismiss (ECF No. 6), asserting that that the Court lacks subject matter jurisdiction to adjudicate a citizen suit under the Clean Water Act because the Regional Water Board is diligently prosecuting an action

---

[3] Plaintiffs assert in their briefing that there should be 183 violations in this category.  (Motion 14:11-12, ECF No. 37-1.)  That number assumes that February 2013 had 29 days.  February 2013 had, in fact, only 28 days.  Plaintiffs do not appear to have made a similar error in calculating the DCBM violations.

against the District for some of the same violations.  The Court previously rejected this argument

in its order denying the first motion to dismiss.  (ECF No. 22.)  The Court then declined to revisit

that decision in its order denying the second motion to dismiss.  (ECF No. 31.)  Defendant

believes that the outcome of this argument is different this time, however, because the Regional

Water Board has now proposed a settlement agreement with the District.  The agreement, if

executed by both parties and pending a 30 day public comment period, would impose $93,000 in

penalties, but would allow the District to pay those penalties by spending that amount towards an

assigned compliance project.  (Rowney Decl., Exh. F., ¶ 5, ECF No. 45-2 ("In lieu of assessing

all of the [penalties], the Parties agree to allow the Discharger to spend an equivalent amount

towards the successful completion of a Compliance Project").)

        Nothing about these facts alters the Court's previous analysis.  *Citizens for a Better

Environment-California v. Union Oil Co. of California*, 83 F.3d 1111, 1116 (9th Cir. 1996)

(settlement payments made in the context of "a settlement made to avoid an enforcement action

by the Regional Board" not construed as "diligent prosecution"); *Wash. Pub. Interest Research

Group v. Pendleton Woolen Mills*, 11 F.3d 883 (9th Cir. 1993) (order requiring discharger to

make physical improvements or face sanctions not diligent prosecution); *N. Cal. River Watch v.

Sonoma Cnty. Water Agency*, No. C 97-4263 CRB, 1998 WL 886645, at *3 (N.D. Cal. Dec. 16,

1998) ("a settlement agreement or a cease and desist order issued by the state is not sufficient to

constitute diligent prosecution under a comparable state law.").  Moreover, the bar for diligent

prosecution "is assessed at the time the citizen-suit complaint is filed," it is not continuously re-

evaluated over the course of the case.  *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*,

728 F.3d 868, 877 (9th Cir. 2013), *citing Knee Deep Cattle Co., Inc. v. Bindana Inv. Co. Ltd.*, 94

F.3d 514, 516 (9th Cir. 1996). As discussed in the Court's order on the second motion to dismiss

(ECF No. 31), the settlement agreement may impact the amount of penalties assessed in this

litigation.  It does not, however, create a triable issue of material fact with respect to liability.

///

///

///

1

## V.     ORDER

2          For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment (ECF

3   No. 37) is GRANTED.  The remaining issue in this case is the assessment of civil penalties in

4   accordance with 33 U.S.C. § 1319(d).

5

6   IT IS SO ORDERED.

7          Dated:   **April 19, 2016**                    /s/ _Erica P. Grosjean_

8                                                    UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28